Please call the next case for argument. 20-1488 from the Eastern District of Missouri. Jessica Langford v. City of St. Louis, Missouri. All right, Mr. Derker, we'll hear from you first. May it please the court, in this rather somber time in our history, I think it's worth quoting what Chief Justice Hughes said in Cox v. New Hampshire because I think it has special pertinence to this case and to this time. Civil liberties as guaranteed by the Constitution imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses. The authority of a municipality to impose regulations in order to assure the safety and convenience of the people in the use of public highways has never been regarded as inconsistent with civil liberties, but rather as one of the means of safeguarding the good order upon which they ultimately depend. And I think this case involves an ordinance of the City of St. Louis that was adopted in reaction to a case decided by this court, the Stahl case, and we are at the confluence of several streams of judicial erudition because I believe Judges Colleton and Woolman were on the panel in the Stahl case, and I believe Judge Colleton wrote the Powell v. Ryan case, on which we rely in part, which, and I'm paraphrasing, said that if Stahl had been standing in the highway, Stahl would have been a different case. In brief, the plaintiff, Ms. Langford, participated in a mass march in the City of St. Louis on Market Street. The march proceeded without a permit. The march proceeded, and it was ending. It was proceeding west on Market Street. It was breaking up, and the police were trying to reopen the blocked streets, and they directed Ms. Langford and others to get out of the street. Ms. Langford elected not to get out of the street, even though people around her immediately were able to do so, and she chose to remonstrate with Lieutenant Boyer, who was trying to get the street reopened, and all he wanted was for her to move to the sidewalk, where she could have continued her remonstrance with him about the perception and role of the police. When she refused to obey his directive, he arrested her for impeding the flow of traffic and disobeying his order, and the City Ordinance, which is quoted, the text is quoted in the briefs. That was an expensive arrest. Well, you know, it was the only arrest. Yeah, I know. It caused you some complications. Well, you know, the ACLU and my able opponents have done a marvelous job of trying to torture the text of the existing ordinance into the stall matrix. I think they have failed. I think a side-by-side comparison of the text of the ordinances show that this current ordinance proscribes very specifically conduct that obstructs or impedes the flow of traffic, and it is the district court embraced the plaintiff's arguments that that ordinance was vague and overbroad, and I submit that it is neither vague nor overbroad, and I think the district court disregarded Colton versus Kentucky. It disregarded the principle that overbreadth analysis is strong medicine to be sparingly applied. It disregarded Judge Clark, about whom we were speaking yesterday. Today I come to praise him. He found that this very ordinance was not vague or overbroad, and admittedly his analysis did not explicitly address the First Amendment context, but I submit that the text of the statute that was upheld by this court in Dewey versus City of Little Rock. I certainly cannot help but concede that there is no express, scienter, culpable state of mind provision in the ordinance. The preamble to the ordinance as it was adopted by the City's Board of Aldermen, I think makes clear that the ordinance was intended to prescribe only intentional conduct, knowing conduct that impeded traffic. The purpose of the ordinance is to promote the safe and free flow of traffic, and pedestrian or vehicular, and Ms. Langford was at liberty to go back to her parking lot, get her car, plaster it with signs about how bad the police are, and drive down Market Street if she wanted to. She could have just gotten onto the sidewalk and continued her idiosyncratic protest against the police. Mr. Durker, as I understand the facts here, this stretch of Market Street had not actually been reopened. The police were in the process of trying to reopen it to traffic. That's correct, Your Honor. Do you think that this ordinance, where there's not traffic actually present, that someone would have the ability to obstruct? Do you think the ordinance is still clear that it covers this kind of situation where there's a future ability to obstruct, but not at the moment of the arrest here? Well, that's certainly the plaintiff's argument in part, and my response is that if someone stands in the middle of a street or a highway and the police cut off the traffic to protect that of traffic. And I think here, Lieutenant Boyer's affidavit clearly said that traffic was unable to move westbound. There was evidence that traffic had started to move eastbound shortly after Ms. Langford's arrest. We certainly agree that there was no traffic in her block the street, because people were in the street, that those people in the street are not impeding the flow of traffic. I think that the duty of the police, when they perceive people in the street who are at risk, I think they have to block the traffic. But what's the causation? I think the cause certainly is the conduct of the people in the street. So I think that if the only way the ordinance can be enforced is to wait until the person in the street is actually, as I put it in the brief, between the headlights, I think that frustrates the legitimate purpose of the ordinance. And so I think that the city is victimized, is wrong, no matter what it does. Let me ask this follow-up on that. Suppose that, I mean, it appears maybe the record wasn't created very well, because there wasn't evidence about the westbound lane here, but suppose the evidence turns out that she was not impeding traffic. Would that mean that the ordinance is unconstitutional, or just that maybe she has a Fourth Amendment claim? Well, if she was not in fact impeding the flow of traffic, she's not guilty. I think it's just like in the Dewey, Arkansas case, where if the noise was not in fact, I can't remember the phrasing of the statute, loud and raucous, if it was not in fact that, then the defendant's not guilty. So I don't think that's relevant to constitutional calculus. Does she have a Fourth Amendment claim? No probable cause. I just meant if it was that not only was she not guilty, but there was not even a basis to arrest her, then she might have a Fourth Amendment claim, but that would be a separate issue from constitutionality of the ordinance. Well, that's correct. If the officer lacked probable cause, and it's a Fourth Amendment violation, yes, that's a different case, and she has a claim for damages. But I submit that the text of the ordinance is plain. It gives fair notice. It compares very closely to the ordinances and statutes approved in Boos v. Berry by the U.S. Supreme Court in Agnew v. District of Columbia. The scienter requirement, the absence of a specific textual scienter requirement, the plaintiff has it both ways, that they say, well, there is none, and even if there were, it wouldn't help. Well, I think there is one. The Missouri Court of Appeals has said that city penal ordinances are subject to such a requirement, and the city is bound by that. And in Frisbee v. Schultz, the Supreme Court of the United States, in a picketing case involving abortion protesters, accepted the representations of the prosecuting authorities as to the scope of the ordinance. If I may, going back to the point about whether she was impeding traffic if the traffic wasn't moving, you say, well, that must count, because otherwise, if the police block the street in order to accommodate the pedestrians, or you say that would be the reason why it counts as impeding, but do you get anywhere close to a vagueness problem there if the person doesn't know that the police are trying to reopen the street or that the police have closed the street because of the pedestrian traffic? Well, Your Honor, my response to that is twofold. Number one, I am guilty of poor practice. I was out of practice too long, and I could have made the record clearer on the state of the traffic westbound, but I don't think that makes the ordinance vague. I think that's the same issue that we just addressed. I think that the ordinance is clear. I think it's a guilty, but I think Lieutenant Boyer had probable cause to believe that it was being violated, and I think that's the standard. He did not have unbridled discretion, and so I submit that the ordinance is not vague. It is not overbroad, and I think that, you know, the officer had no more discretion in enforcing this ordinance than in enforcing a speeding ordinance, and officers may be wrong about whether somebody's speeding or not based on their estimate of his speed, but that doesn't invalidate the ordinance, and I think that, you know, the situation the city judges Lay and Posner, I never thought I'd use those names in the same sentence before, but they excoriated municipalities for not accommodating permitting of spontaneous protests. It's pretty difficult to figure out how we could do that except the way we do do it, which is if you stay on the sidewalk and otherwise obey the traffic laws, you don't need a permit, and so I submit that the ordinance is valid. It is not overbroad. The district judge far exceeded the equitable authority that it has, and we submit it should be reversed, and I will reserve my two and a half minutes for rebuttal if I may. Very well. Ms. Stephan, we'll hear from you. Thank you, Your Honor. Good afternoon. May it please the court. Governments can and probably should regulate traffic, but they cannot categorically ban people from using the streets and sidewalks for speech, which is what this ordinance does on its face. It applies to all streets and all sidewalks at all times, and it applies to the use of those traditional public fora for all purposes, and because it has no exception whatsoever, it has an incidental but quite large burden on speech, and in this context where St. Louis has no workable permit system, there is no way to avoid enforcement of the ordinance, and taking what Mr. Durker said earlier about closed streets, the whole women's march was illegal from the outset, and the police just tolerated the speech until they didn't anymore, so anyone who wants to march or parade or stand on a sidewalk and wave a sign is always risking arrest and is always dependent on the unfettered discretion of police, and it's true that absolutely the police often do tolerate speech. They let some expressive conduct go on without interfering, but when they decide the speech is over, it is, and there is nothing that an individual citizen like Ms. Lankford can do about it or even tell ahead of time what will fall within the law's incredibly large and uncertain ambit. Mr. Durker mentioned several cases today, but he did not discuss the case law that it is most on the ordinance itself cannot survive constitutional scrutiny. Two Supreme Court cases discussed in our briefing, Cox v. Louisiana and McClellan v. Coakley, both dealing with the First Amendment, and then I'll turn to due process and discuss why this law really isn't any different from its predecessor struck down in the Stahl case. So first looking at Cox v. Louisiana, in that case the Supreme Court examined almost an identical situation. In that case, a protester had congregated with others in downtown Baton Rouge, and the sheriff tolerated that action for a while while the group marched and sang and gave speeches just like happened here, and after a while he commanded Cox to move along, but Cox refused and was arrested and charged with a couple of offenses including obstructing public passages, a Louisiana law that looks pretty much just like the St. Louis ordinance at issue here. Like in St. Louis, the Baton Rouge Authority sometimes allowed expression and sometimes did not, and like here, that law did not mention speech in particular, and in fact it did contain a mens rea requirement, but the court still applied the First Amendment and found the law wanting. Ultimately the court held that a city cannot, quote, enable a public official to determine which expressions of view will be permitted and which will not, either by use of a statute providing a system of broad discretionary licensing power, or as in this case, the equivalent of such a system by selective enforcement of an extremely broad prohibitory statute, unquote. But that is exactly what St. Louis has done here. It has enacted a law that looks the same as the law at issue in Cox, and then given its police no objective criteria by which to decide when to enforce it. The Supreme Court made clear more recently in the United States v. Stevens case that at least where speech is concerned, governments can't pass an overbroad law like this one and then just promise to use it responsibly, which is what essentially St. Louis has been doing. And now I'm going to turn to the second case, McClellan v. Coakley, a more modern case. When Cox was decided, the Supreme Court had maybe not yet adopted a specific test for a law like this one, one that's very broad on its face and regulates everything a person might do in a quintessential public forum like this one, including but not limited to speaking. But now it has adopted a test and discussed that test in McClellan. So like in Cox, the McClellan sidewalk counseling law, the law creating buffer zones around abortion clinics, did not mention speech in particular. It applied to a specific segment of sidewalk and it was enacted nominally to prevent sidewalk congestion, just like St. Louis's interest is here. But the law had an incidental burden on speech on people who wish to engage in sidewalk counseling, and so the court applied intermediate scrutiny. This court has since repeated that McClellan rule in the Telescope Media Group case, describing that when a neutral law regulates both speech and non-speech, that law will be analyzed under the incidental burden doctrine of intermediate scrutiny. I want to focus in particular on the third prong of the intermediate scrutiny test, the tailoring that's required. As the McClellan court put it, intermediate scrutiny demands a close fit between ends and means. So here St. Louis espouses an interest in traffic safety, but there is really no fit between that interest and this incredibly broad law. There could have limited enforcement of the law to certain streets, big streets or highways, as Mr. Dirker mentioned, or times of day, or the degree of delay, the length of time it takes, the amount of danger it poses, the number of people congregating. The city has a lot of tools in its toolbox, just like Massachusetts did in the McClellan case. How lengthy an ordinance would that be? Your Honor, if you look at the law that Massachusetts enacted in the wake of McClellan, I think that's a good example of how a law could be narrowly tailored without being unduly long or technical, as you mentioned. The law post-McClellan criminalizes only substantial obstructions and a smaller buffer zone and creates a system of escalating remedies for a municipality that wishes to have such a zone. Well, in this case, do you think the city is required to forbid impeding traffic only on busy streets or highways? Why can't it forbid impeding traffic on all city streets? Your Honor, although the city of course has an interest in regulating traffic, it also has to allow for the use of free speech and assembly on quintessential public forums like streets and it has to engage in kind of a narrow tailoring. It could, as you suggest, create a law that applies to small streets if there is a danger posed or if there is a degree of impedance that is much stronger than the one here. What degree of impedance do you have in mind? What are the degrees of impeding traffic? Well, something more than what happened in Ms. Leningford's case, where as the court pointed out, she was on a closed street. She was also not in the middle of the street, but in a curb lane. And as we've mentioned in the briefing, of course, the law applies to both streets and sidewalks. And so it's under the law as written, if you wanted to, for example, pass out leaflets on a street corner in the city of St. Louis and somebody slows for an instant to take a leaflet from you, that is impermissible under this law. That is illegal. And there aren't any tools for the police to decide when to allow that kind of thing and when not. That is a kind of arbitrary, an encouragement of arbitrary enforcement that a Supreme Court precedent and this court's precedent in due process situations has suggested it is not permissible. You would not have complained had he asked her to get away from out of the middle of the street. Well, she wasn't in the middle of the street, Your Honor. Assume that she was. Wouldn't your argument be the same? Well, I guess so, Your Honor, because there are multiple problems with the ordinance. There is both the problem that Ms. Leningford couldn't tell what she was doing was illegal, the due process problem, and also the ordinance would have to permit her to stand in the middle of the street to make a speech. Well, what I was going to say, Your Honor, is that most cities, if they have an ordinance like this one, a blocking traffic law, they also have some kind of permit system so that a person can tell from the outset whether his or her speech is going to be allowed or not allowed. But in St. Louis, because there is no permit system, I'm permitted to stand in the middle of Market Street. I used to walk back a lot between Union Station and our hotel because that was back when Union Station was still a remnant of a railroad historical station. Now it's turned into some entertainment venue, I understand. Well, that's the life cycle of a museum. That's my digression for the day. St. Louis has lost a lot of that with one's feeling about it. So I don't think, of course, the city has to allow any person to stand in the middle of any street at any time and engage in speech, but the city has to allow some speech. It cannot close the streets totally. It's not permitted to ask someone who's on the borderline to perhaps get into a safer position. Well, I don't think that that's what happened here, Your Honor. But even if it is, no, I don't think so, not under the First Amendment, because the city hasn't engaged in the kind of tailoring that is required of a law that creates an incidental burden on the city. This was certainly not the march across the Edmund Pettus Bridge in Alabama, was it? It was also a large march, Your Honor, but no, certainly not that. It's a tempest in a teapot, isn't it, if truth were told? Well, I don't think so, Your Honor. You're paid to say something else, but we judges have to comport with reality, or at least we should try to, notwithstanding what our opinions may reveal from time to time. I understand, Your Honor. So, no, I don't think so. I think the record demonstrates that this is a continuing problem in the city of St. Louis, that the city engages in arbitrary testifying, and as that testimony was submitted to this court in this case, all protest marches are illegal from the outset, but just permitted, allowed by police when they feel like it. That kind of unfettered discretion isn't permissible under the First Amendment or under the Due Process Clause. Ms. Staffan, what do you think about the part of the ordinance that says that the wording is reasonable movement of vehicular and pedestrian traffic. It seems to protect the reasonable movement, and you're hypothetical about the person that's passing out leaflets and someone stops to receive a leaflet. You said they would be guilty of violating the ordinance, and since it only protects reasonable movement in that case of pedestrian traffic, I'm not sure that they would be guilty in that situation. So, I'd be interested in your take on the meaning of that or the implication of that phrase, reasonable movement of vehicular and pedestrian traffic. Does that, in a way, save the ordinance? I don't think so, Your Honor. So, this is the kind of vagueness, if we're talking about the due process challenge, this is the kind of vagueness challenge that was that issue in stall, not a challenge to the individual words of the ordinance. And as the city interprets the law, and as the police enforce it, whose testimony is part of the record, any march that takes place on any street is illegal from the outset, whether or not there's traffic waiting. And as the court pointed out, there is no evidence in this case that there was traffic waiting. So, I don't think that that language in the law saves the ordinance from either vagueness or the great burden that it has on speech in traditional public fora. Well, if there was no traffic waiting, how did your client violate the ordinance? Or is your position that she did not violate? I don't, well, she was arrested for violating the ordinance and prosecuted for it. I know, but if she was not guilty, then she didn't violate the ordinance. And what I'm trying to understand is if you're really arguing this woman didn't violate the ordinance, although they arrested her for it, why isn't her remedy an acquittal and possibly a Fourth Amendment claim rather than an invalidation of the ordinance? So, Your Honor, under overbreadth doctrine, whether or not she violated the ordinance is basically irrelevant. She is permitted to bring a facial challenge under the First Amendment and raise the rights of third parties before the court. And so, it doesn't matter. That's true. But isn't it also true that an overbreadth challenge would rarely succeed against a statute that's not aimed at speech? I think that the law on that is clearer since McClellan was decided. Because in the McClellan case, that law was not aimed at speech. It was just presence on that area of the sidewalk. And yet it was very clear to the Supreme Court that the incidental burden version of intermediate scrutiny applied to that statute. And so, it should also apply here, especially where the conduct that is criminalized here is limited to conduct in traditional public fora that are traditionally held open to people to speak their views publicly. So, I think that once we've determined that the law is overbroad, it is the intermediate scrutiny test that applies. So, if I understand it, then you're saying maybe your client did not violate the ordinance. You're bringing an overbreadth claim based on hypothetical scenarios in which other people might violate the ordinance. And on that basis, is claiming the statute is overbroad. Is that a fair summary of your answer? I think that that is the first part of the First Amendment claim. Yes, Your Honor. When it's overbroad on its face, it almost doesn't matter what her course of conduct was as long as it was enforced against her, which it was. As to the due process challenge, I do think that she personally experienced the kind of encouragement of arbitrary enforcement that the law allows on its face. I see that I'm out of time. And so, we would just request that the court affirm the district court's grant of partial summary judgment mislaying for its favor and remand for resolution of the issue of damages. Very well. Thank you for your argument. Thank you, Your Honor. Mr. Derker, we'll hear from you in rebuttal. May it please the court. First of all, in connection with the vagueness issue, I remind the court of Justice White's comments in Colton v. Dilemma, the practical difficulties of drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. I think common sense tells you you don't stand in the streets and obstruct traffic, but there is no categorical ban on speech. The record, I think, you know, Ms. Stephan, understandably, puts her spin on the record, but I think that the record clearly shows that when you have thousands of people taking over a street in broad daylight and major thoroughfare, under this ordinance, it is illegal right away. But the city does have a permit scheme. And that was part of the record also. The city's approach, I admit, can be somewhat confusing because the city attempts to deal with spontaneous, unpermitted protests and marches by allowing them to continue. But the city does have a permit ordinance, and this ordinance is aimed at the impeding ordinance is clearly aimed specifically at conduct and clearly aimed at promoting public safety by keeping the streets and sidewalks clear of obstructions. And the example of the leaflet here and the citizens stopping to converse with the leaflet here, you know, I think that is a distortion of the plain meaning of the ordinance. I don't think anybody would think that the ordinance applies in that situation. How about McCullen? How about McCullen and Cox? Well, yeah, I'm glad you mentioned that because I'd like to invert to what Chief Justice Roberts says about the Commonwealth points to a substantial public safety risk. That is, however, an example of its failure to look to less intrusive means. Any such obstruction can readily be addressed through existing local ordinances, and he quotes, no person shall stand or place any obstruction of any kind upon any street, sidewalk, or crosswalk in such a manner as to obstruct a free passage for travelers thereon. So Chief Justice Roberts is alluding to this kind of an ordinance as an alternative to this arbitrary buffer zone. So I don't think McCullen really helps the plaintiff's case. Cox, you know, I'm not going to shilly-shally that's a strong case that if it applies is very strong on their side of the equation, but I think this is Cox v. New Hampshire and Colton v. Kentucky, not Cox v. Louisiana, which has an exemption, a content exemption for labor picketing. So we ask that the district court be reversed. And I'm glad it didn't take 35 years for me to see Judge Woolman again. The years do pass by. Judge Colton's probably tired of me already, though. Well, we thank both lawyers for the arguments. The case is submitted, and the court will file an opinion in due course. Thank you, Your Honor. Thank you, Ms. Stephan. You're both excused.